[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Jon Berardino and the defendant Lori Semrau lived with each other from approximately September, 1995, through July, 1997, and were engaged to be married for a substantial portion of that time. Both were in their early twenties. The plaintiff's principal business was buying, rehabilitating and selling properties; the defendant was principally a law student, though she was employed briefly during relevant periods. In July, 1997, the ill-starred relationship unraveled, as will shortly be developed; much of the difficulty arises from the application of contract notions to domestic situations.
In April, 1996, the plaintiff arranged for the purchase of a deteriorated property at 39 Hollis Avenue in Meriden. Financing was found in a greater amount than the assessed value, and the parties arranged for title to be placed in the defendant Semrau's name, apparently for tax purposes. As both were single in the eyes of the Internal Revenue Service, it apparently made sense to the parties at the time to spread any taxable income between the two.[1] The parties shared a joint checking account from which most expenses apparently were paid; most, but not all, of the deposits into the account were made by the plaintiff Berardino. The plaintiff conducted all of the business surrounding the transaction, and the plaintiff's money paid for most, if not all, of the work done on the property.
During much of the following year improvements were made in the property, but it was not yet ready for resale when the balloon of the first note became due, and, if the parties were to keep the property, some sort of refinancing had to be found. The plaintiff testified that because the defendant had little or no income and her credit history was not perfect, lenders insisted that the property be removed from her name. The plaintiff, therefore, accomplished refinancing by buying the property from her and arranging for a loan in a significantly greater amount than the original mortgage. At the closing, the defendant received a check for the difference, which was $28,337.12. The plaintiff testified that he thought the defendant would deposit the check in their mutual account, and the proceeds would be used for wedding plans, a trip to St. Maarten, and further improvements to the property in order for the property to be sold. CT Page 11838
The defendant's testimony was remarkable by comparison in the sense that the same largely undisputed contractual events were part of an entirely different overall scenario. When the defendant received title to the property in 1996, she thought that she truly owned the property, although she agreed that she participated in few, if any, of the transactions other than the closing. She maintained that several of her many brothers and sisters did some work on the premises during the ensuing year. Most critically, she testified that she ended the engagement in May, 1997, as she thought the relationship was abusive and destructive. She said that she had wanted simply to sell the property, but that the plaintiff insisted that he buy it from her. Even though the engagement was over, according to the defendant, she and her putative mother-in-law bought a wedding dress in June, invitations were ordered and the plaintiff and the defendant still went to St. Maarten together a day or two after the closing of July 3, 1997.
As noted above, Berardino testified that he thought Semrau would deposit the check from the closing in a joint checking account.[2] Semrau testified that she never intended to do anything other than to keep the proceeds herself, as she reckoned that this was a way to distribute the assets of the failed relationship. In a business transaction which is itself somewhat murky, she and apparently one of her sisters opened a checking account at another bank on the same day as the closing and deposited the net proceeds from the closing in the new account. In any event, as the parties left for St. Maarten, the plaintiff apparently believed that the proceeds were safe in the joint checking account, while the defendant knew that the funds were in an account controlled by her and apparently her sister.[3]
When they returned from St. Maarten, the parties and their Bernese Mountain dogs, Moonshine and Stogie Bear, went to Pennsylvania and visited Semrau's parents. They left the dogs with the elder Semraus, and returned with a puppy for Berardino. Berardino testified that it was in Pennsylvania that Semrau told him it was over. When they returned, Berardino testified that he discovered that the house in which they lived, 161 Preston Avenue, had been significantly emptied of its contents. Semrau testified that she had started to move things out long before. It was in this time frame that Berardino found out that the proceeds from the closing had not been deposited in the joint account; he testified that he still thought that money could actually be used CT Page 11839 for the purposes he had anticipated, even if it was in a different account. He soon found out, however, that the money was, from his point of view, gone.
Berardino's second amended complaint is in fifteen counts. Each one need not be recited here. Count one alleges many of the underlying facts and claims conversion of the proceeds of the July 3, 1997, closing; count two alleges unjust enrichment, based on the same allegations; count three, a constructive trust; count four, damages for failure to release a second mortgage on the 39 Hollis Avenue premises[4]; count five, unjust enrichment as to the second mortgage; count six, specific performance of the agreement to release the second mortgage; count seven, a declaration that the second mortgage be declared null and void; count eight, theft of property from the 161 Preston Avenue premises; count nine, conversion of the same; count ten, unjust enrichment based on the removal of the items; count eleven, unjust enrichment because of payments the plaintiff allegedly made toward the defendant's pickup truck; count twelve, unjust enrichment regarding the balance of the joint checking account; count thirteen, unjust enrichment regarding charges on a credit card; count fourteen, unjust enrichment for the payment of back taxes paid by the plaintiff for the plaintiff's family's house; and count fifteen, fraudulent misrepresentation regarding the proceeds of the closing.
For reasons not germane to this opinion, the defendant was defaulted during the pendency of this action. The defendant later filed a notice of defenses, which indicated that various matters would be contested. See § 17-34 of the Practice Book. Although ordinarily the entry of a default constitutes an admission of the truth of the facts alleged in the complaint, a defendant may, if a timely notice of defenses is filed, offer evidence contradicting one or more allegations of the complaint. In this situation, the defendant then has the burden of proof to disprove those allegations which she contests. DeBlasio v. AetnaLife Casualty Co., 186 Conn. 398, 400-01 (1982).[5]
The issues, then, are whether the defendant has disproved, by a preponderance of the evidence, the various counts of the complaint.[6] Although the court has considered at length the testimony, exhibits and arguments, the discussion of each count will be somewhat succinct.
The first count alleges conversion of the net proceeds of the CT Page 11840 July 3 closing. Conversion occurs when "one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights."Polivy v. Air One, Inc., 46 Conn. App. 573, 577 (1997). This court finds the count disproved, as technically the defendant had title to the proceeds and technically there is at least a degree of authorization. The second count alleges unjust enrichment as to the receipt of the proceeds. Unjust enrichment is a broad equitable doctrine the essential elements of which are that (1) the defendant received a benefit; (2) the defendant unjustly did not pay for the benefit; and (3) the failure to pay for the benefit inures to the detriment of the plaintiff. See, e.g.,Zanoni v. Hudon, 48 Conn. App. 32, 39 (1998). The court finds that the defendant has not disproved the elements of unjust enrichment, and thus finds for the plaintiff as to this count. The third count alleges a constructive trust as to the same proceeds. The elements of constructive trust are closely akin to unjust enrichment: where a conveyance was based on trust and confidence and that trust has been abused, equity will intervene to prevent an unjust enrichment; the imposition of a constructive trust requires that the title be conveyed to the equitable owner.Schmaling v. Schmaling, 48 Conn. App. 1, 13, 18 (1998). The parties have not addressed the issue of whether the doctrine of constructive trust applies where the disputed matter is cash only: it would appear that the more general doctrine of unjust enrichment suffices in the circumstances of this case. As no greater remedy would be afforded under the doctrine of constructive trust, I find the count academic.
The next several counts involve the second mortgage which Berardino conveyed in favor of Semrau in order to facilitate financing of the property. In short; Semrau now holds a security interest in the amount of $7,500. Count seven seeks a declaration that, as the contemplation was that the second mortgage would be released voluntarily after the closing was completed, the security interest ought to be null and void. Count five alleges unjust enrichment as a result, and count six alleges specific performance of the agreement to release the mortgage. Count four rather vaguely alleges that the failure to release the mortgage was wrongful. Again, I find that the allegations regarding an agreement to release the mortgage have not been disproved, and I find that the appropriate remedy as the this cluster of counts is specific performance. Relief, then, is granted as to count six, and the defendant is ordered to release the second mortgage to him so that he may file the release on the land records. Counts CT Page 11841 four, five and seven are, then, academic.
Count eight alleges that various items of personal property belonging to Berardino were wrongfully taken from the 161 Preston Avenue premises by Semrau or someone acting on her behalf. I find that Semrau has disproved the allegations as to many, but not all, of the items. The items effectively disproved include the bed and mattress, the stove, the dogs, the boat and trailer, the cable boxes, and the knife set. Although the valuation of the remaining items is necessarily somewhat imprecise, I find the market value at the time of the conversion[7] to be $1500; as the damages for civil theft are tripled according to § 52-564
of the General Statutes, judgment may enter in favor of the plaintiff in the amount of $4500 as to count eight. As a result of the conclusion as to count eight, counts nine and ten, alleging conversion and unjust enrichment, are academic.
The court finds that the defendant has disproved by a preponderance counts eleven, twelve, thirteen and fourteen. These counts allege that Semrau has been unjustly enriched by virtue of payments Berardino made on her pickup truck, and by the allegations that the remainder of the joint checking account was withdrawn by Semrau, that additional charges were made on a joint credit card, and that Berardino paid property taxes on the home into which Semrau moved. Although probably most of the money which paid for these items came from Berardino's income, these are the sort of payments which are made in the course of quasi-conjugal relationships, and I find the lack of injustice in retaining the benefits proved.[8]
Finally, count fifteen alleges fraudulent misrepresentation. Berardino claims that Semrau falsely and with intent to deceive represented that she would place the proceeds of the closing in the joint checking account, and that the proceeds would be used to pay their joint living expenses and for further improvements on the Hollis Avenue premises. She also allegedly represented that the second mortgage would be released on completion of the financing arrangements. The count alleges that the statements were made with the intent to induce Berardino to act thereon. The count further alleges that he did rely on false statements to his detriment.
The elements of fraudulent misrepresentation are (1) a false representation of fact[9]; (2) the representation is untrue and known to be untrue; (3) the statement is made to induce the other CT Page 11842 to act; and (4) the latter does so act to his injury. Kilduff v.Adams, Inc., 219 Conn. 314, 329-29 (1991). Additionally, in order to be actionable, the plaintiff must show a causal relationship between the statement and the action; that is, if the conduct would have occurred in the absence of the statement, then fraudulent misrepresentation has not been proved. See Bradley v.Oviatt, 86 Conn. 63 (1912).
On the basis of the burden of proof, the court finds that the statements in issue were in fact made: although the court finds neither side especially credible, the defendant has the burden of disproving the allegation by a preponderance, and she has not done so. In fact, the defendant testified that she intended to take the money all along, which is inconsistent with a statement that she would put the money in the joint account. The court finds by a preponderance of the evidence, however, that the plaintiff would have pursued the transaction in the absence of any statement, as it was necessary, he stated, to the lender that the property be in his name. There is, then, an absence of causal relation between any statement which may have been made and the actual action taken. Judgment may enter for the defendant on this count.
In summary, judgment may enter for the plaintiff in the amount of $32,837.12 in monetary damages, and the defendant is to file a release of the second mortgage on the land records by no later than November 10, 1998. Additionally, interest pursuant to § 37-3a of the General Statutes is awarded as to the $28,337.12 from July 3, 1997, and as to the $1500 from July 20, 1997.
Beach, J.